**IN THE COURT OF APPEALS OF IOWA**

No. 22-1859
Filed January 10, 2024

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF LYNN KRUSE,**

**LYNN KRUSE,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Craig E. Block, Judge.


        An adult appeals the appointment of a guardian and conservator.

**AFFIRMED.**


        Amanda Green of Takekawa & Green, PLLC, Ankeny, for appellant.

        Kevin Cunningham of Cunningham & Kelso, P.L.L.C., Urbandale, for

appellee.


        Considered by Tabor, P.J., Buller, J., and Danilson, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BULLER, Judge.**

Marylin ("Lynn") Kruse appeals the order appointing her son as her guardian and conservator. Finding substantial evidence supports the probate court's findings and conclusions, we affirm.

## I.     Background Facts and Proceedings

Lynn is an eighty-two-year-old woman with two adult children, Eric Weinberg and Kerstin Weinberg. Lynn lived alone at her house in West Des Moines and, in 2020, she called the police seventeen times between February and August to report people were either breaking into her house or pumping poisonous gas into her residence. Police officers came to investigate on each occasion and found no evidence supporting Lynn's concerns.

In September 2022, Eric and Kerstin visited Lynn at her house for dinner. When Eric arrived, he noticed Lynn had "all her suitcases packed," but she told Eric she wasn't going anywhere. Lynn later told Kerstin she was leaving the country with psychics. Lynn's explanation concerned Eric and Kerstin because Lynn had a history of corresponding with and regularly sending money to psychics. While Lynn was in another room, Eric put Lynn's suitcases in his truck to prevent her from leaving. After consulting with a West Des Moines police officer, Eric completed paperwork to have Lynn evaluated by a mental health hospital. That hospital admitted Lynn but later transferred her to another medical center in southeast Iowa. That October, the district court entered an emergency order appointing Eric as Lynn's temporary guardian and conservator.

Later that month, Lynn's geriatric psychiatric provider prepared this letter:

[Lynn] is a patient of mine who has been on the geriatric inpatient psychiatric unit . . . .  This patient has a clinical history of both schizophrenia and delusional disorder and has been hospitalized [three] times prior to this dating back to the mid 2000[s].  Based on the comprehensive history gathered throughout this patient's hospitalization we have been able to identify that the patient has been struggling with delusionary symptoms throughout her life span.  It appears that she has adapted fairly well and has been able to maintain her independence up until this point.  The patient's delusions have gotten to the point where they are now interfering with her ability to perform her activities of daily living.  Specifically, her home is now in disrepair and she is failing to shower (only bathing [one or two] times a week with a washcloth).  She does not shower because she believes somebody will hear her showering and harm her.  She also believes that someone is pumping noxious gases into her home and is isolating herself as a result.  The patient's family has tried sending her meals, but this eventually resulted in the patient believing her children are poisoning her food.  This lack of bathing has led to multiple urinary tract infections and due to the physical effects of this, results in a worsening of her mental state.  She has very poor insight into the nature of her mental illness and is only accepting treatment begrudgingly due to court committal.  She is also making poor choices and has been victim to scammers via mail.  Because her delusions are so prominent, they are interfering with her ability to function independently putting her at further risk of decline without increased social supports.

At the hearing on the pending petition for appointment of a guardian and conservator, Eric was not surprised by any of the psychiatric provider's statements in the letter.  He confirmed Lynn's history of mental-health problems and hospitalizations and noted: "This has been going on for seven, eight years and it's finally come to something has to be done."  Eric knew Lynn had been hospitalized twice in 2019, though he was not aware they were mental-health commitments.  Eric noted Lynn believed people were trying to hurt her and had become "a prisoner of her own home."  He also testified he found out about Lynn's many phone calls to law enforcement from a police officer.  And he became aware—after Lynn's committal—that her home and car insurance had lapsed for non-payment.

Eric expressed concern about Lynn's vulnerability to psychics "ripping her off" because "she shouldn't be sending them a blessed nickel." Because Lynn refused to live with either of her children, Eric agreed with Lynn's psychiatric provider that Lynn should reside in an assisted living facility; "I don't see it possible to be back in her house."

Eric's testimony also provided the foundation for admission of Lynn's December 2015 durable power of attorney and designation of health care surrogate nominating Eric to act in her stead. He asked that the court appoint him as guardian and conservator for Lynn.

Kerstin is an out-of-state resident and had been trying to contact Lynn for months without success. When Eric went to Lynn's home and asked why she was not calling Kerstin, Lynn said she did not have her charger cord. Eric purchased Lynn a cord and ensured the phone was charging. But when Kerstin still did not hear from Lynn, she drove from Washington state to Lynn's home. Lynn was very slow to respond to Kerstin's knocking but eventually came to the door. Kerstin realized Lynn could not remember her passcode to her phone and was unable to "interact[ ] with any of the text messages or calls that she was getting." Kerstin testified Eric had asked Lynn to move in with either of them, but Lynn refused. Kerstin noted that, because Lynn seemed to be doing well in a structured environment, an assisted living situation was the only option; Kerstin believed Lynn returning to her own home was "not tenable." She also supported appointing Eric as guardian.

Lynn testified and generally denied needing assistance, medically or financially. While Lynn acknowledged she could benefit from an occasional visit

from a cleaning person, she denied any mental-health problems. But Lynn's testimony indicated otherwise, as she described conspiracies and claimed she was given instructions by Central Intelligence Agency (CIA) agents. Lynn maintained the postal service quit delivering her mail and lied to her about it, so she was missing payments for lack of notice. She also testified her "telephone quit and then when I tried to get back into it, I couldn't" and Kerstin "took it and she was supposed to get it fixed but I guess she didn't." Lynn noted she had income coming in, though she "doe[sn't] keep track of all these numbers" and acknowledged she was having difficulty paying her bills—though she claimed that was "because of the post office."

At the end of the hearing, the district court concluded Lynn was unable to provide for her own care, safety, well-being, or to manage her financial decisions without the assistance of a guardian and a conservator. The court found Eric suitable and qualified to continue to serve in those roles. The court wrote:

> That upon review of the medical exhibits, [Lynn] is currently under a mental health commitment and displays schizophrenia and delusional behavior. She has been the victim of scammers and lacks . . . insight into the nature of her mental illness and only accepts treatment if court ordered through a commitment. [Lynn] is no longer able to live independently and refuses help. She is unable to function independently and puts her own health and safety at risk. Her children testified as to the poor decisions she is making and her hallucinations that she is being poisoned in her own home. [Lynn] in her testimony denies her need for a guardian and conservator and denies she is in need of assistance. Without oversight to insure the medications are taken and assistance with her daily needs, [Lynn] is at risk of injury to herself and vulnerable for financial exploitation. [Lynn] lacks the capacity to understand the severity of her mental condition.

The district court determined a limited guardianship was "not appropriate in this matter." Instead, the court appointed Eric as guardian and conservator for

Lynn, specified the decisions Eric was able to make for Lynn without further court approval, and set out the decisions that required application to and approval of the court.

Lynn appeals, contending there is insufficient evidence she is unable to care for her personal safety or attend to her needs. Alternatively, she argues the court did not adequately consider a limited guardianship and conservatorship.

## II. Standard of Review

We review the involuntary appointment of a guardian or conservator for errors of law. Iowa Code § 633.33 (2022). The district court's findings are binding on us if supported by substantial evidence. *See In re Conservatorship of Leonard*, 563 N.W.2d 193, 195 (Iowa 1997). "Evidence is substantial or sufficient when a reasonable mind would accept it as adequate to reach the same findings." *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 693 (Iowa Ct. App. 1991).

"We construe the trial court's findings broadly and liberally. In case of doubt or ambiguity we construe the findings to uphold, rather than defeat, the trial court's judgment. We are prohibited from weighing the evidence or the credibility of the witnesses." *Id.* (internal citations omitted).

## III. Discussion

In a proceeding to appoint a guardian or conservator for an adult, it is the petitioner's burden to present "clear and convincing evidence" of "incompetency." Iowa Code § 633.551; *see also In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) (noting "clear and convincing evidence" means "there are no serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence.").

Section 633.3(25) defines "incompetent" as meaning

the condition of any person who has been adjudicated by a court to meet at least one of the following conditions:
(a) To have a decision-making capacity which is so impaired that the person is unable to care for the person's personal safety or to attend to or provide for necessities for the person such as food, shelter, clothing, or medical care, without which physical injury or illness may occur.
(b) To have a decision-making capacity which is so impaired that the person is unable to make, communicate, or carry out important decisions concerning the person's financial affairs.
(c) To have a decision-making capacity which is so impaired that both paragraphs "a" and "b" are applicable to the person.

Lynn argues the evidence does not prove she was incompetent, noting her diagnoses are not new and she has managed her own affairs to date. But her psychiatric provider's letter, along with Eric and Kerstin's testimony, provides substantial evidence to the contrary. As does Lynn's own testimony describing conspiracies and contact with the CIA. The evidence shows Lynn's personal health has been adversely affected by her hygienic activities, she rejected meals believing they are poisoned, and she refused to let anyone she doesn't know into her home (and sometimes those she does know). Lynn's refusal to take prescribed medications is also affecting her mental health and risking her safety. Her own testimony also shows she was unable to manage her financial affairs and did not know how to receive her mail or access her phone.

Lynn asserts the court did not adequately consider a limited conservatorship or guardianship. She maintains: "The court did not consider the capabilities of Lynn and the availability of third-party assistance." Lynn's own testimony indicates third-party assistance was not a viable option. She refused voluntary assistance from her own children and did not trust people she didn't know. Without a guardian,

Lynn will refuse necessary medical treatment and medication, which is necessary to keep her safe. Lynn's delusions were interfering with her activities of daily living and negatively impacting her ability to manage her financial affairs. Without a conservator, her financial affairs have gone unmanaged. The district court did not err in concluding a limited guardianship and conservatorship were inappropriate.

**IV.     Disposition**

Because substantial evidence supports the district court's findings of incapacity and the court did not err in finding a limited guardianship or conservatorship would be inadequate, we affirm.

**AFFIRMED.**